IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM WHITE,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | Case No: 06 C 5610<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM AND ORDER

The plaintiff, William White, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr. White asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. White applied for DIB on September 15, 1998, alleging that he had been disabled since January 9, 1997, as a result of a truck accident. (Administrative Record ("R.") 106). He said he suffered a spinal injury, injury to his eyes, a pinched nerve in his neck, severe arthritis, and memory loss. (R. 101-103, 106). His application was denied initially and upon reconsideration. (R. 36, 38). Mr. White continued pursuit of his claim by filing a timely request for hearing on December 1, 2003. (R. 48).

An administrative law judge ("ALJ") convened a hearing on January 27, 2000, but adjourned it after a brief time so that additional medical records could be ordered and Mr. White could return with his attorney. (R. 552-578A). On March 17, 2000, the hearing reconvened and Mr. White, represented by counsel, appeared and testified. (R. 579-680). In addition, a medical expert, Dr. Bianchin, and a vocational expert, Cheryl Hoiseth, also testified. (R. 620, 678). On April 12, 2000, the ALJ issued a decision denying Mr. White's application for DIB because, although he could not perform any of his past relevant work, he could perform at least a full range of sedentary work. (R. 507-12). Mr. White filed a timely request for review of that decision with the Appeals Council.

On June 18, 2002, the Appeals Council remanded the case to the ALJ for further proceedings. (R. 502-03). The Appeals Council instructed the ALJ to obtain additional evidence regarding Mr. White's impairment(s), and to give proper consideration to additional treating and examining source opinions which had been unavailable at the time of the ALJ's decision, specifically those found in the depositions of Henry Kawanaga, M.D., and clinical psychologist C. Schiro-Geist Ph.D. (R. 502). Further, the Appeals Council indicated that the ALJ was to "request the treating and examining sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what [Mr. White] can do despite the impairments." (R. 503). The Council also wanted the ALJ to evaluate Mr. White's symptoms in accordance with disability regulations, and explain the weight given to all of the opinions in the record, consider the combined effect of Mr. White's limitations, provide an "appropriate rationale for all findings," determine Mr. White's residual functional capacity ("RFC") in

keeping with the applicable Social Security Rulings and, if appropriate, obtain evidence from a vocational expert. (R. 503).

The ALJ convened Mr. White's administrative hearing for a third time on May 8, 2003. (R. 681-766). Mr. White again appeared and testified, and was represented by the same attorney. (R. 681). There were new medical and vocational experts present to provide testimony. (R. 712, 735). On July 24, 2003, the ALJ issued a second unfavorable decision, finding Plaintiff not entitled to DIB because he could perform his past relevant work as a warehouse clerk and a security guard. (R. 24-32). This became the final decision of the Commissioner when the Appeals Council denied Mr. White's request for review of the decision on June 25, 2004. (R. 9-11). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. White has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Mr. White was born on September 24, 1955, making him forty-seven years old at the time of the ALJ's decision. (R. 101). He is 5' 9" and weighs 250 pounds. (R. 754). IIe has a tenth-grade education. (R. 109). Mr. White has a diverse work history. He suffered his injury in January of 1997, while working as a delivery driver for a radiator company. (R. 109, 111, 139, 567, 592). That was heavy work, requiring a great deal of walking and standing, and frequent lifting of fifty pounds. (R. 114). After that, he had a

couple of very brief stints doing roofing work in the summer of 1998, but could not keep those jobs because of his injury. (R. 109, 111, 567-68, 582-83). Before his delivery driver job, Mr. White worked in security for a railroad equipment company from 1991 to 1995. (R. 115, 592). He drove a truck and walked around the property all night, checking on equipment and facilities. (R. 115). The work required little lifting, but constant standing, walking, and bending. (R. 115). Before that, in the 1980s, he managed an auto repair shop for four or five years, scheduling repairs. (R. 594-95). He has trained as a forklift operator, and has used computers to check stock in a warehouse. (R. 109, 742-44).

## B.

## Medical Evidence

As already noted, Mr. White's troubles began when he was injured in a truck accident while at work In January 1997, his vehicle being rear-ended and turned on its side. (R. 181). He was taken to Loyola University Medical Center, and had a CT scan and x-rays but they were negative, and he was discharged with instructions to follow-up with his treating physician. (R. 156, 162-71). Dr. Henry Kawanaga treated Mr. White on January 21, 1997, and planned to have him undergo an MRI, and instructed him to remain off of work until further notice. (R. 177).

On January 26, 1997, Mr. White had cervical and lumbar MRIs performed. The cervical MRI revealed central disk herniation at the C4-5 level producing mild to moderate spinal stenosis and central disk herniation at the C5-6 level without significant spinal stenosis. (R. 178). The lumbar MRI revealed degenerative disk disease at the L5-S1 level of the lumbar spine with probable mild diffuse disk herniation. (R. 179).

4

Dr. Kawanaga prescribed physical therapy, and Mr. White underwent a course of treatment including deep heat, ultrasound, massage, and stretching, from February 19, 1997 through April 1, 1997. (R. 192). Mr. White was also prescribed Vicodin for pain. (R. 326). At the end of the course of physical therapy, the physical therapist performed a functional capacity evaluation. She determined that Mr. White would be unable to return to his delivery truck job, because he was at the medium physical demand category. (R. 195). He was able to lift fifty pounds from the floor to his waist, and 45 pounds from his waist to over his head. (R. 193, 195). But apparently, this was on a "one time only basis and [could] not be repeated on a daily basis." (R. 194). He could sit for 15 minutes and stand for 20 before needing to change positions. (R. 195). He was also restricted in his ability to bend, which meant it would be difficult for him to increase his physical tolerances. (R. 195). Almost all of the testing was limited by Mr. White's complaints of severe pain. (R. 199-200).

On April 16, 1997, Dr. Edward Goldberg, an Orthopaedic surgeon, saw Mr. White at the request of his employer's workers' compensation insurance company. (R. 322). He observed that Mr. White's range of motion in his neck and lower back was somewhat limited. (R. 326). Neurological exam was normal. (R. 326). The doctor reviewed Mr. White's MRIs and CT scan and the physical therapist's report and determined that Mr. White could return to medium level work as found in the evaluation. (R. 326). The question was whether his employer could accommodate such restrictions, or whether Mr. White could improve his capacity. (R. 326-27). This was, however, subject to clearance from Mr. White's neurologist and ophthalmologist. (R. 326). Mr. White was suffering headaches and blurred vision. (R. 326-27).

Mr. White underwent another worker's comp insurance exam on April 30, 1997. Dr. Russell Glantz's examination of reflexes, sensation, and motor strength was essentially normal. (R. 323). Mr. White did have some trouble focusing his right eye. (R. 323). The doctor determined that, from a neurological standpoint, there was no evidence of a persisting central nervous system dysfunction, and that Mr. White's head pain was probably "residual" from his accident trauma. (R. 323).

Mr. White attended a work-hardening clinic in the spring of 1997. (R. 218). During a four-hour period, he was able to lift 40 pounds frequently and 56 pounds occasionally. (R. 218). He could simulate job conditions for 30-45 minutes. (R. 219). But he developed severe back pain and stiffness after his sixth session and was unable to attend any further sessions. (R. 218). The therapist felt Mr. White could go back to his "previous occupation given his present physical complaints do not limit his abilities." (R. 218).

Next, Dr. Robin Snead, a general practitioner, examined Mr. White on October 21, 1998. (R. 232). He complained of short term memory loss, severe pain from his neck to hands, low back pain radiating to his feet that increased with bending and sitting, and seeing bubbles in front of his eyes when experiencing headaches. (R. 232-33). By that time, he was taking Naprosyn for pain. (R. 233). Dr. Snead diagnosed Mr. White as having central weakness in his right upper extremity, with a parietal drift on the right upper extremity. (R. 234-35). She also noted that Mr. White had an uncoordinated gait, decreased range of motion in his cervical and lumbar spine, positive straight leg raising on the left, and some paresthesias in his left leg. (R. 234-35). His left leg was cooler to

6

the touch than his right. (R. 234-35). Dr. Snead recommended Plaintiff undergo a CT scan or MRI of the brain. (R. 235).

On December 28, 1998, Dr. Mahim Vora conducted a consultative psychiatric examination. (R. 243-44). Mr. White denied feeling depressed. (R. 243). He did relate experiencing quite a bit of trouble with his memory, however. (R. 243). He said he did not socialize or go out. (R. 243). Mental status examination was mostly normal, except for Mr. White having some problems recalling a list of numbers, performing serial sevens, and making correct change. (R. 244). Dr. Vora's diagnosis was rule out organic brain disorder secondary to head trauma. (R. 243). He thought that Mr. White would have trouble handling any benefits he might be granted due to his impaired memory. (R. 244).

At that point, in January 1999, psychologist Kirk Boyenga reviewed Mr. White's file for the Agency. He found that Mr. White had no severe psychological impairment. (R. 245). He felt Mr. White's primary impairment was physical in nature. (R. 246). Curiously, he said he responded very well to tests of memory. (R. 246). Any functional limitations Mr. White might suffer from a psychological standpoint would be slight. (R. 252).

About the same time, Dr. Barry Free, who also reviews medical records for the Agency, went over Mr. White's records from a physical standpoint. The doctor felt Mr. White could lift 50 pounds frequently and 25 pounds occasionally. (R. 255). He also felt Mr. White had no limitations on his ability to sit, stand, push, or pull. (R. 255). Mr. White could climb, balance, kneel crouch, and crawl occasionally. (R. 256). He had no problems manipulating objects or seeing. (R. 257).

On May 19, 1999, Mr. White had a consultative examination with Dr. Stanley Rabinowitz at the request of the Agency. (R. 260). Mr. White's sensation, reflexes, motor strength, and cerebellar function were all grossly normal. (R. 265). Dr. Rabinowitz noted a somewhat decreased range of motion in Plaintiff's lumbar spine, but normal straight leg raising. (R. 265). He found Mr. White's gait to be normal, and he also conducted a pulmonary function study, which resulted in a finding of mild obstructive airway disease. (R. 265). He also noted that Mr. White was morbidly obese. (R. 266).

On June 17, 1999, there was another Agency review of Mr. White's medical records, this time by Dr. Frank Jimenez. It was essentially the same as Dr. Free's review. (R. 271-78).

Dr. Kawanaga sent Mr. White for additional MRIs on February 1, 2000. (R. 365). The scan showed asymmetric disk bulging at L4-5, disk dessication at L5-S1, and mild disk herniation at L5-S1. (R. 365). There were also minimal disk bulges in the thoracic spine at T8-9, T9-10, T11-12, and a focal high signal lesion on T2 representing a small hemangioma, or a mass resulting from a proliferation of blood vessels. (R. 365). In the cervical spine, there was disk bulging at C3-4, disk herniation at C4-5 impinging on the ventral right aspect of the cervical cord, resulting in moderate stenosis, a tiny central disk herniation at C5-6 impinging on the ventral central spinal fluid, and broad-based disk herniation at C6-7 impinging on ventral central spinal fluid column. (R. 366-67).

On May 12, 2000, Dr. Kawanaga was deposed as a part of Mr. White's worker's compensation case. When he first examined Mr. White in 1997, he found his range of motion to be limited, but reflexes normal and no motor weakness. (R. 464). He thought

8

that Mr. White's pain might be due to a herniated disk and he scheduled an MRI. (R. 465). When the result showed disk herniation in the cervical spine, Dr. Kawanaga felt that explained Mr. White's neck pain. (R. 467). It was not sufficiently severe for surgery, however, so he recommended conservative treatment. (R. 467). By June of 1997, Dr. Kawanaga felt Mr. White could return to his delivery driver job if "he would get some help in lifting so that he would not have to do a lot of heavy lifting." (R. 480, 495-96).

When Mr. White returned to Dr. Kawanaga and indicated he was unable to do that, Dr. Kawanaga suggested he look into the possibility of Social Security Disability. (R. 482-83). By then, there was not much Dr. Kawanaga could offer in the way of conservative treatment. (R. 484). The second set of MRIs demonstrated increased impingement on the spinal cord. (R. 486). Objective examinations, however, did not reveal any evidence of neurological involvement. (R. 490). In the end, Dr. Kawanaga felt Mr. White was permanently and totally disabled from any occupation, even "something of a desk job . . . because sitting seems to bother him just as well as standing at times." (R. 487, 492). He also said that Mr. White shouldn't do any lifting "given what he has complained about . . . ." (R. 496). But, at the same time, the doctor felt an additional functional capacity evaluation would be helpful. (R. 495). As for surgery, it would be complicated due to Mr. White having disk herniation at three levels. (R.493-94). Shortly after the deposition, Dr. Kawanaga explained this to Mr. White, telling him he "should learn to live with problem." (R. 527).

On June 25, 2000 and July 1, 2000, Chrisann Schiro-Geist, a clinical psychologist, interviewed Mr. White. (R. 453-457). During these interviews, Mr. White

9

related his medical problems and financial problems, pain and unsuccessful work attempts, as well as his reduced daily activities and lifestyle changes since his accident. (R. 453-54). He said he was depressed as result of what had happened to him. (R. 455). Dr. Schiro-Geist administered the Wide Range Achievement Test, and found that Mr. White read and performed arithmetic at a ninth-grade level, which was borderline to low average. (R. 456). The Wechsler Adult Intelligence Scale demonstrated Mr. White's Verbal IQ to be 86, which was in the low average to average range. (R. 456). Based on her interviews, testing, and the medical records, Dr. Schiro-Geist felt Mr. White was not capable of substantial work available competitively. (R. 457).

Not long after providing her report, Dr. Schiro-Geist was deposed in Mr. White's worker's compensation case. She explained that she did not administer any psychological test, but thought Mr. White exhibited symptoms that were not inconsistent with situational depression. (R. 400-401). She could not offer a diagnosis, however. (R. 401). As far as Mr. White's physical capacity, she relied on Dr. Kawanaga's opinion that he was permanently and totally disabled. (R. 420).

## C.

## Administrative Hearing Testimony

At his March 2000 hearing, Mr. White testified that he typically wakes up at nine o'clock in the morning, and goes to bed at ten o'clock at night. (R. 602). He has trouble falling asleep and is awakened by pain every other hour. (R. 602). He has no hobbies, and generally spends his days laying or sitting down; he lays on his left side to relieve his pain. (R. 603). He thought he could sit for probably half an hour before experiencing pain and needing to change his position. (R. 603). Even that does not relieve the pain,

10

however; it merely lessens it. (R. 604). He can stand for about fifteen minutes before he has to lean against something or sit down. (R. 604). He has great difficulty bending over. (R. 604-05). Lifting as little as ten pounds causes pain. (R. 605). He can walk around the block before he had to sit down, and riding in a car is painful. (R. 607).

Mr. White does not participate in any clubs and cannot help with chores around the house. (R. 609). He occasionally goes shopping to get out of the house. (R. 609). He can wash and dress himself, but stated that, for example, if the soap is left on the floor of the shower, his pain "activates" from trying to pick it up and he cannot shower; he also does not like to tie his shoes because of the bending involved. (R. 611).

At his hearing on May 8, 2003, Mr. White testified that he regularly took two 750 m.g. Vicodin tablets every four hours to relieve his pain, and occasionally took Flexeril, a muscle relaxer, when his neck pain became especially difficult. (R. 697). Vicodin makes him drowsy and kills the pain a little bit, but does not make it go away. (R. 614). In addition, Mr. White uses Albuterol four times each day for his asthma, Enalapril to slow his heart rate, and diabetes medication. (R. 698-99).

Mr. White said that in 2002, he developed left shoulder pain that ran up to his neck and made it very stiff. (R. 694). He testified that x-rays showed his shoulder was inflamed, and he received Cortisone to relieve the pain, but the treatment was not effective. (R. 694-95). In addition, Mr. White said he had short term memory problems, but had not seen a doctor about it. (R. 720).

Dr. Daniel Girzadas then testified as a medical expert. He opined that Mr. White had "herniated disks in the lumbar spine and cervical spine which are causing neurological symptoms." (R. 716). Just moments later, Dr. Girzadas contradicted

11

himself and stated that Mr. White had "[n]o neurological symptoms." (R. 717).[1] He said that such conditions such as those demonstrated in Mr. White's MRIs could cause pain, but were "not suitable or reasonably necessary to have surgical intervention." (R. 716). He thought that Mr. White could lift twenty pounds occasionally and ten pounds frequently, and that he could stand for two hours and sit for six. (R. 717). He noted that Mr. White was taking medication for tachycardia and that it controls the symptoms. (R. 718). He did not agree with Dr. Kawanaga's assessment that Mr. White was disabled because "[t]he overwhelming preponderance of the lifting recommendations do not suggest it. The PT reports . . . did not agree with him." (R. 728). The doctor did not doubt, however, that Mr. White suffered neck pain – he was not sure about ataxic gait or paraparesis. (R. 730). He explained that pain was subjective, there was no way to measure it, and that the medical findings regarding Mr. White's neck and back were "positive agents for pain." (R. 732). In determining Mr. White's residual functional capacity ("RFC"), Dr. Girzadas was not "quantifying" Mr. White's pain, but at the same time he was estimating what would be a reasonable amount of pain based on the medical findings. (R. 733).

Grace Gianforte then testified as a vocational expert ("VE"). She questioned Mr. White about his work history, beginning with his security guard job and working her way through his delivery driver job and roofing jobs. (R. 735-41). Along the way, he operated a forklift and checked inventory in a warehouse. (R. 743). The questioning was fairly superficial, revealing nothing of each job's physical demands, or what skills they involved. (R. 748).

---

[1] Given the medical record, and the testimony of Mr. White's treating physicians, Dr. Girzadas must have misspoken when he said there *were* neurological symptoms.

The ALJ asked Ms. Gianforte whether a hypothetical 47-year-old individual with a ninth-grade education and the foregoing work history who was capable of lifting twenty pounds occasionally and ten pounds frequently, and standing for two hours and sitting for six could perform any of Mr. White's past relevant work. (R. 755-56). Ms. Gianforte felt the only two jobs such an individual could perform were warehouse clerk and security. (R. 756). Aside from that, she thought such an individual could work as a cashier, bill and account collector, and insurance claims clerk. (R. 757). The ALJ then asked the VE to assume additional limitations including the inability to lift even a gallon of milk, a need to lie down during the day, and restrictions in reaching and manipulating, and asked whether such an individual could perform any work. (R. 758-59). Ms. Gianforte thought not. (R. 760).

## III.

## THE ALJ'S DECISION

The ALJ found that Mr. White had not engaged in substantial gainful activity since January 9, 1997, the date he alleges he became disabled. (R. 25, 30). Next, he determined that Mr. White had the following severe impairments: slight disk bulge at L4-5; mild, broad-based disk herniation at L5-S1; disk bulge at C3-4; herniated disk at C4-5; tiny central disk herniation at C5-6, and broad-based disk herniation at C6-7. (R. 26). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. §§ 404.1520(c). But he also found that none of Mr. White's impairments, either singly or in combination, met or equaled an impairment listed in the Agency's

13

regulations as disabling. (R. 30). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ concluded that Mr. White did not have a severe mental impairment, noting that Dr. Schiro-Geist said she was "unable to confirm such a diagnosis (depression and/or memory loss), since she never examined claimant. She speculated at best, about a possible 'situational' depression and simply relied on claimant's alleged complaints of pain, having merely 'interviewed' him on two occasions." (R. 26). He also pointed out that Dr. Geist did not perform the type of tests that she herself indicated would be necessary before she could make a diagnosis of depression. (R. 26). The ALJ discounted Mr. White's allegations of memory loss because he had not complained to his treating physician about it and was able to testify without hesitation at the hearing. (R. 26).

The ALJ then summarized the medical evidence, including the MRI results and work tolerance evaluations. He then stated that the medical evidence supported "the found residual functional capacity for light work." (R. 28). The ALJ noted that Mr. White's headaches were controlled with medication and that neurological exams in May 1997 and May 1999 were normal. He noted that one physician was of the opinion in October of 1998 that Mr. White was out of shape and needed exercise. Surgery had not been recommended. And the medical expert, Dr. Girzadas said that whether Mr. White suffered the degree of pain he claimed to was a matter of speculation. (R. 28). Accordingly, the ALJ found that Mr. White could lift twenty pounds occasionally and ten pounds frequently, stand for two hours and sit for six during an eight-hour workday, and had no manipulative limitations. (R. 29). The ALJ said that all postural efforts could be performed on an occasional basis. (R. 29).

The ALJ explained that he gave great weight to the medical expert's opinion that Mr. White could perform such work and rejected the opinion of Mr. White's treating physician that he was disabled. (R. 29). He recounted Dr. Girzadas as testifying that Mr. White had no neurological defects and that there was "simply no evidence to support [the] opinion" that Mr. White could do no lifting. (R. 29). Dr. Girzadas expected Mr. White's condition could cause some pain, but not so much that he could not do light work. (R. 29). As for Mr. White's credibility, the ALJ felt he "exaggerat[ed] his problem" and the fact that surgery had not been recommended weakened his claims of disabling back pain. (R. 29, 30).

The ALJ went on to find that Mr. White could perform his past relevant work as a warehouse worker and security guard. (R. 29). In so doing he relied on the testimony of the vocational expert. (R. 29-30). As a result, the ALJ found that Mr. White was not disabled and not entitled to DIB under the Act before that date. (R. 30-31).

## IV.

## DISCUSSION

### A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, – F.3d –, —, 2008 WL 340513, *5 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security

Administration. *Berger*, 2008 WL 340513, *5; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 2008 WL 340513, *6; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 2008 WL 340513, *5.

**B.**

### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.

### Analysis

Mr. White argues that the ALJ failed to give the proper deference to the opinions of Drs. Kawanaga and Schiro-Geist, made an improper credibility determination, and

provided an erroneous RFC analysis. The Commissioner argues that essentially, this case is about the fact that out of all the medical opinions in this case, only one – that of Dr. Kawnaga – indicated that Mr. White was disabled. Furthermore, Dr. Schiro-Geist made no diagnosis of depression. As for the ALJ's finding that Mr. White could perform past relevant work, the Commissioner argues that any error was harmless because the vocational expert identified other jobs Mr. White could perform. Ultimately, I find that this case must be remanded to address problems with the vocational evidence. As such, there need not be in depth discussion of the other issues Mr. White raises here, but a few comments are warranted.

## 1.

### Dr. Kawanaga's Opinion

Mr. White submits that the ALJ did not accord proper deference to the opinion of his treating physician that he was totally disabled. Generally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). But a treating physician's opinion is not the final word on a claimant's disability because, as the Seventh Circuit has noted, "[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007)(quotations omitted). Or, put another way, "many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards

to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

In *Hofslien*, Judge Posner remarked that the treating physician rule "seems to take back with one hand what it gives with the other, and as a result to provide little in the way of guidance to either administrative law judges or counsel." 439 F.3d at 376. He explained:

> The rule directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." Obviously if it is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.

*Id.* at 376.

Here, after summarizing the medical evidence, including functional capacity evaluations from physical therapists and consulting physicians, the ALJ set forth his reason for rejecting Dr. Kawanaga's opinion as follows:

> Dr. Girzadas specifically and expressly disagreed with Dr. Kawanaga's opinion that claimant could do no lifting, stating there was simply no evidence to support that opinion in the record; and though he expected that claimant's condition could cause some pain, again, he believed claimant should be able to exert as testified. Therefore, Dr. Kawanaga's opinion is not given controlling weight.

(R. 29). The ALJ added that Dr. Girzadas's opinion agreed with Dr. Bianchin's opinion at the March 2000 hearing (R. 29), and that in his notes, Dr. Kawanaga essentially recites Mr. White's complaints without any citation to clinical or test results. (R. 30).

I cannot find that the ALJ erred in choosing to accord greater weight to the opinions of two medical experts, and of consulting physicians, than he did to the opinion

of Mr. White's treating physician. An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Moreover, the opinions of medical experts – like Drs. Girzadas and Bianchin – and State Agency consultants – like those that assessed Mr. White's RFC here – can provide an adequate evidentiary foundation for a finding of "not disabled." *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). "In the end, 'it is up to the ALJ to decide which doctor to believe-the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of similar cases-subject only to the requirement that the ALJ's decision be supported by substantial evidence.'" *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(*quoting Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992)); *Arnold v. Barnhart*, 473 F.3d 816, 824 (7th Cir. 2007)(ALJ charged with resolving conflicts among medical opinions.).

Beyond that, Dr. Kawanaga's opinion that Mr. White is completely disabled is not entirely convincing standing alone, it being somewhat equivocal and a bit too reliant on Mr. White's complaints. Dr. Kawanaga originally felt that Mr. White could return to his job as delivery truck driving as long as he did not do any heavy lifting. (R. 480). Dr. Kawanaga also felt that Mr. White would benefit from some work hardening and perhaps find less demanding employment. (R. 478480, 482, 494-96). When Mr. White said he could not do it, it was Dr. Kawanaga that suggested applying for DIB. (R. 482-83). The doctor seemed to simply accept Mr. White's complaints at face value (R. 487, 492, 496), although he admitted that examinations did not produce the objective neurological

findings that one might expect. (R. 468, 485, 489-90). His opinion that Mr. White could do no lifting was admittedly based on Mr. White's complaints. (R. 496). And, despite his stated opinion, Dr. Kawanaga felt a more definitive answer might be provided by a further functional capacity evaluation. (R. 494-96). Dr. Kawanaga seems a bit too accepting of Mr. White's complaints, and not entirely convinced that his opinion is on solid ground. Both are valid reasons not to accord his opinion controlling weight. *Hofslien*, 439 F.3d at 377; *White*, 415 F.3d at 659.

### 2.

### Dr. Schiro-Geist's Opinion

Mr. White also argues that the ALJ ought to have accorded more weight to Dr. Schiro-Geist's opinion that Mr. White was limited in his ability to walk, stand, and sit; demonstrated borderline to low intellectual abilities; had difficulty concentrating due to pain; and suffered from situational depression. He argues that Dr. Schiro-Geist's opinion is consistent with Dr. Kawanaga's and that her findings as to Mr. White's mental condition are uncontradicted in the record.

Dr. Schiro-Geist opined that Mr. White was completely disabled. (R. 418). But it is no surprise that her opinion is consistent with that of Dr. Kawanaga. Dr. Schiro-Geist, not a physician, explained that she simply drew her opinion as to Mr. White's physical capacities from Dr. Kawanaga. (R. 420). That opinion has already been addressed. As for Mr. White's intellectual capabilities, Dr. Schiro-Geist did not opine that they were disabling. Instead, she said they were consistent with the work he had been doing. (R. 420). Meaning that his low average intellectual capacity was not disabling.

That leaves Mr. White's allegations of depression. Dr. Schiro-Geist did not administer any of the tests that she says she ordinarily would to arrive at a diagnosis of depression. (R. 400-02). She was "just saying that his symptomatology is not inconsistent with . . . situational depression." (R. 401). She stopped short of offering a diagnosis of depression. (R. 400-02). The absence of a definitive diagnosis is why the ALJ discounted Dr. Schiro-Geist's report. (R. 29). Instead, the ALJ chose to credit the opinion of the Agency reviewer, Dr. Boyenga.

Ordinarily, there would be no problem with the ALJ disregarding the "tentative" – or non-existent – diagnosis of Dr. Schiro-Geist. *White*, 415 F.3d at 659 (tentative diagnoses not documentation of psychological disorder). After all, it was admittedly not well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2); *White*, 415 F.3d at 658. But one wonders about the ALJ's reliance on the report of Dr. Boyenga, who seems to have ignored or misread evidence of Mr. White's impaired memory.

More to the point in this instance, however, is the ALJ's failure to follow the Appeals Council's instructions on remand. He was instructed to request additional evidence from examining sources – like Dr. Schiro-Geist – as to what work Mr. White was capable of despite his impairments.[2] He did not do so, in violation of the regulations. 20 C.F.R. § 404.977(b)("The [ALJ] shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."). In some instances, an ALJ's failure to follow the Appeals Council's instructions might be harmless error. *Metzger v. Astrue*, 2008 WL 397578, \*4

---

[2] The ALJ did receive and consider further evidence, in the form of clinical notes, from Dr. Kawanaga. (R. 523-28).

(7th Cir. 2008). But not here. *See, e.g., Allen v. Astrue*, 2007 WL 1276933, *3 (E.D.Pa. May 1, 2007)(failure to abide by Appeals Council's instructions reversible error); *Lee v. Barnhart*, 2006 WL 3370524, *9 (W.D.N.Y. Nov. 16, 2006)(reversible error where ALJ failed to obtain additional evidence as instructed by Appeals Council); *Tauber v. Barnhart*, 438 F.Supp.2d 1366, 1376 (N.D.Ga. 2006)(reversible error where ALJ failed to follow Appeals Council's order requiring further development of the record).

Dr. Schiro-Geist is on record as recommending a "true clinical assessment" of Mr. White's condition. (R. 425). The evidence the ALJ favored over Dr. Schiro-Geist's opinion is questionable. And at the final administrative hearing, Mr. White's attorney made a point of alerting the ALJ to Dr. Schiro-Geist's recommendation. (R. 687-86). As this case is to be remanded in any event, the Agency should arrange for a psychiatric consultative examination with an eye toward assessing what kind of work Mr. White can perform despite any psychological impairment he might have.

### 3.

### The ALJ's Credibility Determination

Mr. White also finds fault with the ALJ's credibility determination. It was a bit terse: the ALJ felt Mr. White "exaggerat[ed] his problem" and that his claims of disabling back pain were weakened by the fact that surgery had not been recommended. (R. 29, 30). To be fair, however, the ALJ also discussed the testimony of the medical expert, Dr. Girzadas, which focused on Mr. White's complaints of pain and whether they were of a level to be expected given the objective medical evidence. (R. 26, 29). The doctor opined that although Mr. White would experience some pain given the results of

23

his MRI, it would not be of a disabling level. Even Mr. White's treating physician commented on the lack of objective findings. (R. 490).

While an ALJ may not disregard an applicant's subjective complaints of pain simply because they are not fully supported by objective medical evidence, a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). Where the ALJ might have strayed from SSR 96-7p is in his lack of discussion of Mr. White's daily activities and his course of treatment *short* of back surgery, as well as his treating physician's reason – the multiple disks involved – for not recommending surgery in his case. *See, e.g., Schmidt*, 395 F.3d at 747. That can be corrected on remand as well.

A bit more troubling is the manner in which the ALJ discounted Mr. White's allegations of memory problems, partially because Mr. White was able to answer questions at the hearing, but partially because Mr. White had not mentioned memory problems to any treating physician. Perhaps not, but he mentioned his memory problems to Dr. Vora (R. 243-44), Dr. Snead 234-235), and Dr. Schiro-Geist. (R. 396, 719). Drs. Snead and Vora found it significant. (R. 235, 244). On remand, the evidence regarding Mr. White's memory problems ought not be brushed aside so casually.[3]

---

[3] Mr. White also says the ALJ failed to consider his obesity. But although references to Mr White's height and weight in his medical records were likely sufficient to alert the ALJ to the impairment, he does not specify how his obesity further impaired his ability to work. Additionally, the ALJ adopted the limitations suggested by the medical expert who was aware of Mr. White's obesity. (R. 762). Thus, Mr. White's weight was factored indirectly into the ALJ's decision as part of the medical expert's opinion. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

**The Vocational Evidence Does Not Support the ALJ's Conclusion
That Mr. White Can Perform His Past Relevant Work**

The VE testified that, based on the RFC the ALJ posited, Mr. White could perform two of his former jobs: security guard and warehouseman. The only information in the record regarding the demands of Mr. White's job in security comes from the questionnaire he completed upon his application for benefits. (R. 106-119). There, Mr. White explained that the job involved little lifting – no more than ten pounds frequently – but required constant walking and standing, as he had to patrol the property of the railway company. (R. 115). It also required constant bending: he had to check around the railroad equipment. (R. 115).

While that job's lifting requirements would not exceed the ALJ's RFC finding for Mr. White, the other requirements certainly would. The ALJ found him limited to two hours of standing per day – the ALJ made no finding as to walking. (R. 31). The ALJ also found that Mr. White could only perform "postural efforts" – such as bending – occasionally, not constantly or even frequently. (R. 31). So if Mr. White is limited to the degree the ALJ found, he could not perform his past relevant work as a security guard. The ALJ failed to compare Mr. White's RFC with the requirements of his past work, which he was required to do. *See Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004)(ALJ must consider whether plaintiff could perform the duties of the specific jobs plaintiff held); *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991)("To determine whether [a claimant] is physically capable of returning to her former work, the administrative law judge obviously must ascertain the demands of that work in relation to the claimant's present physical capacities."). In fact, similar to *Nolen*, where a remand

was ordered, 939 F.3d at 519, the ALJ here did not even describe the requirements of Mr. White's past work.

There are similar problems with the ALJ's finding that Mr. White could return to his job as warehouseman as well, but moreover, that job does not even qualify as past relevant work. To be relevant, past work must have been done within the last 15 years. 20 C.F.R. § 404.1565(a); *Wolfe v. Shalala*, 997 F.2d 321, 323 n.4 (7th Cir. 1993). The exchange between Mr. White and the VE regarding this position sprang from her question about him being a computer operator, which Mr. White does not list as a job he performed but as a duty he had at one of his jobs over the past fifteen years. (R. 109). The VE took this to be a distinct position, called a "warehouseman," which required very minimal physical effort. It is far more likely that it was simply one aspect of Mr. White's heavy delivery job – checking inventory in the warehouse on the computer. But even if that is not the case, and there was a distinct warehouseman job in Mr. White's work history, the hearing testimony provides not so much as an inkling as to when Mr. White held this job (R. 743-44). At the March 2000 hearing, Mr. White was asked about his work history in reverse chronological order, from his brief roofing jobs, back to his delivery and security jobs. (R. 590-593). Those jobs go back more than fifteen years into the past, dating back to the 1980s. The only job resembling anything like a warehouse job was a job managing an auto repair shop. (R. 594). But again, that was before Mr. White's security work, which means it was too far in the past to qualify as past relevant work.

So one past job the ALJ found Mr. White able to perform requires more standing, walking, and bending than the ALJ thought Mr. White capable of. The other was either

26

not a job at all or was one that does not qualify as past relevant work. The Commissioner does not address the problem of whether the warehouseman job was past relevant work, focusing instead on the question of the demands of that job and the security guard job. No matter, according to the Commissioner, that the ALJ did not mention the demands of these jobs no matter, because "the [VE] questioned [Mr.] White at length about the requirements of [his] past work." (*Defendant's Response to Plaintiff's Motion for Summary Judgment*, at 11). Not so. Through several pages of testimony, there was absolutely no questioning regarding how much Mr. White had to lift or carry, how long he had to stand, or how far he had to walk. (R. 735-47). As such, the only information the VE might have had about the demands of Mr. White's work as a security guard and a warehouseman was from the forms Mr. White filled out when he applied for DIB. Based on that information, the demands of Mr. White's past relevant work exceeded what the ALJ found to be his RFC.[4]

Failing that, the Commissioner submits that even if Mr. White cannot perform his past relevant work, the VE testified that there were other jobs he could do. That testimony provides an adequate basis for a finding of "not disabled" even though the ALJ neither mention it nor relied upon it. In support of this argument the Commissioner cites *Sienkiewicz v. Barnhart*, 409 F.3d 798 (7th Cir. 2005). But there, the ALJ set forth his analysis through to step five. 409 F.3d at 803. He did not stop at step four as the ALJ

---

[4] Although the ALJ may not merely compare a plaintiff's RFC with the demands of a "similar" job, or the same "type of work," the ALJ can "base his comparison on the functional demands and job duties of the [applicant's past] occupation as generally required by employers throughout the national economy." *Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004). The Commissioner does not suggest that is what the ALJ did here, however, and there is nothing in the VE's testimony or the ALJ's decision to indicate that he did. If that was what he was thinking, his failure to mention it violates the requirement that he build a "logical bridge" between the evidence and his decision to allow the reviewing court to follow his reasoning. *Giles*, 483 F.3d at 486; *Dixon*, 270 F.3d at 1176.

did here. The court had a written analysis to review, as opposed to an alternative reasoning provided by the Commissioner's lawyers who, though able, are not charged with rendering disability determinations. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)(" . . . general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)(same).

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/9/08